2022 IL App (1st) 210329-U
Order Filed: April 28, 2022

FIRST DISTRICT
FOURTH DIVISION

No. 1-21-0329

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 20740 |
| | ) | |
| RAYMOND HARRIS, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Reyes and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirmed the summary dismissal of defendant's postconviction petition alleging ineffective assistance of trial counsel.

¶ 2    A jury convicted defendant, Raymond Harris, of robbery and first degree murder and the trial court sentenced him to mandatory natural life imprisonment under the Habitual Criminal Act (730 ILCS 5/5-4.5-95(a) (West 2016)) based on his prior Class X convictions for armed robbery, aggravated arson, and attempted first degree murder. On direct appeal, this court affirmed. See *People v. Harris*, 2019 IL App (1st) 160238-U. Defendant subsequently filed a postconviction petition alleging ineffectiveness of trial counsel. The postconviction court summarily dismissed defendant's petition at the first stage of proceedings. On appeal, defendant contends that the

postconviction court erred in summarily dismissing his petition as the allegations of ineffective assistance have an arguable basis in law and fact. We affirm.

¶ 3    Prior to trial, the defense filed a motion to suppress a pair of Nike gym shoes and a pair of Polo gym shoes recovered by the police from the residence of defendant's fiancé on the day of his arrest, November 8, 2011. There were three blood stains on the Nike shoes and two blood stains on the Polo shoes. DNA testing was performed on the blood stains, revealing that the blood did not belong to the victim in this case. The court denied the motion to suppress. However, given the DNA results, the State informed the defense and the court that it did not intend to introduce the shoes at trial.

¶ 4    The evidence at the jury trial established that on the evening of October 22, 2011, the 73-year-old victim, Virginia Perillo, drove to a grocery store and went inside to make a purchase at about 5:25 p.m. The victim's son, Mark Perillo, was shown the store's surveillance videotape from October 22 and identified the victim and her black handbag from which she was retrieving money to pay the cashier. Perillo explained that the victim usually carried "a couple hundred dollars" in cash in an envelope inside her black handbag.

¶ 5    One of the victim's neighbors, Joe Liberti, testified that at about 7:15 p.m. on October 22, 2011, he drove past the victim's home at 3302 South Parnell and saw that the garage door was closed. Judy Naujokas, another of the victim's neighbors, testified that about 15 minutes later she noticed that the victim's garage door was open and the garage light was off, which was "very unusual." When Liberti returned at about 9:15 p.m., he saw that the victim's garage door was open and that she was lying in the center of the garage in a pool of blood. Liberti called 911.

¶ 6    Officer Paul Weichert testified that he arrived at the scene at 9:26 p.m. and saw the victim lying on the floor of the garage between two vehicles. The driver's side door to one of the vehicles

was open and the engine was running. There was blood around the victim's head, and she obviously had suffered massive trauma to her face. The swelling and bruising was so severe that the officer could not make out the victim's facial features. Weichert radioed for paramedics.

¶ 7　Detective Thomas Carr testified that he arrived at the crime scene around 10 p.m. The victim already had been transported to the hospital. Carr saw the two vehicles in the garage. There was a large pool of blood on the floor of the garage between the two vehicles. Carr stated that "[t]o the west of that was a footprint in the blood."

¶ 8　Carr went to the hospital to speak with the victim, but he was unable to do so due to the extent of her injuries. While at the hospital, Carr went through the victim's personal belongings and determined that she only had $12 in cash. The victim subsequently died in the hospital as a result of her injuries. The medical examiner concluded that the manner of death was homicide.

¶ 9　Officer David Ryan testified he arrived at the crime scene at approximately 11:35 p.m. after the victim had been transported to the hospital. He saw two automobiles parked in the garage, a Lexus and an Acura, and a "large pool of blood" between the two vehicles. Ryan looked underneath the Acura and saw part of a watchband "just to the rear of the driver's door." He then looked inside the vehicle and "saw the watch just poking out a little from under the driver's seat on the front driver's side floor."

¶ 10　Wendy Gruhl, a forensic scientist employed by the Illinois State Police, testified that the watchband found underneath the victim's automobile tested positive for blood. Gruhl took a swab of the bloodstain, which was sent to another forensic scientist, Jaime Bartolotta, who conducted DNA testing and determined that a major profile matched the victim's profile (meaning that the blood on the watchband belonged to the victim).

¶ 11     Bartolotta also conducted DNA testing on swabs taken from the watch recovered from the victim's automobile and identified a mixture of DNA from at least three people. Bartolotta was able to identify a major male DNA profile. The DNA profile was searched in a DNA database and an association was made with defendant.

¶ 12     Bartolotta requested confirmatory testing on the watch, which was conducted by forensic scientist Ryan Paulson. Paulson testified that a major male DNA profile found on swabs taken from the watch matched defendant's DNA profile.

¶ 13     Defendant's brother, James Tinnel, testified that in mid-October 2011, defendant temporarily moved in with him at his residence at 2920 South Dearborn in Chicago, about one mile from the victim's residence. Defendant arrived with a gym bag full of clothes, and nothing else. While living with Tinnel, defendant spent much of his time on the Internet, looking for jobs and seeking shelters where he could stay once he moved out of Tinnel's residence.

¶ 14     On October 22, 2011, defendant's mother hosted a family party at her house at 817 East 130th Place. Tinnel and his wife arrived at the party around 6:30 p.m. Defendant received a ride from his cousin, Kimberly Carter, and they arrived about 9:30 or 10 p.m. Defendant was wearing a brand new "jogging suit" as well as a black necklace and baseball cap that Tinnel had never seen him wear before. At the party, defendant pulled out three or four $100 bills, as well as some $10 and $20 bills and began counting them. Defendant told Tinnel that an ex-girlfriend, Michelle Rogers, had wired him the money through Western Union. However, Rogers testified that she did not send defendant money in October 2011, and had only wired him money on two occasions— $50 in June 2011, and $30 in August 2011.

¶ 15     Tinnel testified that at the family party, defendant showed a wedding band and engagement ring and said he wanted to propose to a woman named Loraine Reed. Tinnel described the wedding

band and engagement ring as "dullish" like they were "old and used." Tinnel's wife similarly testified that the wedding band and engagement ring were "tarnished" and "dull" and did not look brand new.

¶ 16   On the day after the family party, October 23, 2011, defendant asked Tinnel whether he knew of a jewelry store that could resize, clean, and engrave the engagement ring and wedding band. Tinnel drove defendant to a jewelry store, where defendant spoke to the owner, Mr. Chong, who stated that he would have to send the ring and wedding band to another store to have the requested work performed on them. Chong told defendant to come back on October 27.

¶ 17   Marcos Torres testified that he works at a jewelry repair shop and that some of his work includes cleaning and engraving rings. In late October 2011, Chong brought him the engagement ring and wedding band that defendant had dropped off on October 23. Torres cleaned and removed old engravings on the wedding band and engagement ring and put in new engravings and then returned them to Chong.

¶ 18   Loraine Reed testified that on October 27, 2011, she and defendant went to Chong's store and picked up the engagement ring and wedding band, one of which was engraved with her name and the other engraved with her birth date. Then they went to defendant's mother's house, where defendant gave her the newly engraved ring and wedding band and proposed to her.

¶ 19   Detective David Feltman testified that on November 8, 2011, he arrested defendant. Later that day, Feltman spoke with Reed and recovered the engagement ring and wedding band that defendant had given to her. Carr showed photographs of the wedding band and engagement ring to the victim's son, Perillo, on November 8 and told him that they had been recovered from the suspected murderer. Perillo identified the engagement ring and wedding band as belonging to the

victim and he testified that he had seen them "countless" times during his "whole life growing up" because the victim always wore them.

¶ 20    At defendant's trial, the watch recovered from the victim's automobile was shown to Tinnel, Reed, and to defendant's aunt, and they all identified it as belonging to defendant. Tinnel stated that he had seen defendant wearing the watch every day while defendant was staying with him the week before the murder. Defendant's mother testified that a few days after the October 22 family party, defendant asked her if she had seen his watch, and she told him no.

¶ 21    The jury convicted defendant of robbery and first degree murder and the trial court sentenced him to natural life imprisonment. On direct appeal, defendant contended that the State made improper remarks during closing argument. We affirmed. *Harris*, 2019 IL App (1st) 160238-U.

¶ 22    Defendant then filed a *pro se* postconviction petition raising claims of ineffective assistance of trial counsel, to which he attached the statement of facts from his brief on direct appeal, his own affidavit, his high school transcript and other student records, and his medical records. In pertinent part, defendant alleged that his trial counsel provided ineffective assistance by failing to interview and call as a witness his cousin, Kimberly Carter. Defendant's attached affidavit stated Carter would provide an alibi by testifying that on the night of the murder she continually was with defendant at her residence from before 7 p.m. until she drove him to his mother's house for the party at 9 p.m. Defendant did not attach an affidavit from Carter to his petition.

¶ 23    Defendant also alleged in his *pro se* petition that his counsel was ineffective for failing to perform a forensic comparison of his shoes recovered from Reed's residence with the bloody shoe print left at the scene and "admit into trial as evidence the results of the bloody shoe print at [the]

scene of [the] murder as no match to defendant." In support of this claim, defendant's affidavit stated that the bloody shoe print did not match the victim's shoe size, nor did it match the shoe size of two pairs of defendant's shoes that were recovered from Reed's residence.

¶ 24    The postconviction court summarily dismissed defendant's petition at the first stage of proceedings. This appeal followed.

¶ 25    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a method by which defendant can assert that his conviction resulted from a substantial denial of his constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Under the Act, a postconviction proceeding not involving the death penalty contains three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the court must independently review the petition within 90 days of its filing and, taking the allegations as true, shall dismiss it if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a) (West 2020); *Hodges*, 234 Ill. 2d at 10. Where a defendant is acting *pro se*, his petition should be given a liberal construction and reviewed leniently. *Id.* at 21. We review *de novo* the summary dismissal of defendant's petition. *Id.* at 9.

¶ 26    A petition is frivolous or patently without merit when it has no arguable basis either in law or in fact. *Id.* at 16. A petition lacking an arguable basis in law or in fact is one that is based on an indisputably meritless legal theory or a fanciful factual allegation. *Id.* An example of an indisputably meritless legal theory is one that is completely contradicted by the record. *Id.* Fanciful factual allegations are those that are fantastic or delusional. *Id.* at 17.

¶ 27    Postconviction petitions must comply with section 122-2 of the Act, which provides that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2. The purpose of the "affidavits, records, or other evidence" requirement is to establish that the allegations in the

petition are capable of objective or independent corroboration (*Hodges*, 234 Ill. 2d at 10) and to identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations. *People v. Allen*, 2015 IL 113135, ¶ 32. *Pro se* petitioners are not excused from complying with section 122-2. *Id.* ¶ 24.

¶ 28    Defendant's petition here alleged ineffective assistance of trial counsel. Ineffective assistance of counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on a claim of ineffective assistance, defendant must show that his counsel's performance was objectively unreasonable and that he was prejudiced thereby such that there is a reasonable probability that but for his counsel's unreasonable performance, the result of the proceeding would have been different. *People v. Petrenko*, 237 Ill. 2d 490, 496-97 (2010). "At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced." (Emphasis added.) *Hodges*, 234 Ill. 2d at 17.

¶ 29    Where defendant raises a postconviction claim of ineffectiveness of trial counsel based on the failure to call a witness, the claim must be supported by an affidavit from the proposed witness, or other evidence showing that the witness could have provided testimony favorable to defendant (*People v. Dupree*, 2018 IL 122307) or shall state why the affidavit or other evidence was not attached.725 ILCS 5/122-2. The failure to attach the necessary supporting material or explain its absence is "fatal" to a postconviction petition and "by itself justifies the petition's summary dismissal." *People v. Collins*, 202 Ill. 2d 59, 66 (2002).

¶ 30    In the present case, defendant alleged in his petition that his trial counsel was ineffective for failing to call his cousin, Kimberly Carter, as an alibi witness and he attached his own affidavit attesting that Carter would testify that she was with him at the time of the murder and that he did not commit the crime. However, defendant did not attach an affidavit from Carter, which is "fatal" to his petition unless there is an explanation for why her affidavit was not attached or there was other evidence in the record showing that Carter could provide an alibi.[1] *Id.* Defendant's only explanation, stated in his petition, for why he did not attach Carter's affidavit is that he has a learning disability and needed a fellow prisoner's help in drafting the petition and that he had "diligently written" Carter and asked her for an affidavit but that he has "no knowledge if my mail ever reached [its] destination."

¶ 31    The Act provides no standard by which we should judge defendant's explanation for why Carter's affidavit is absent. However, our supreme court has stated that the absence of the supporting affidavit must be "adequately" or "sufficiently" explained in order to preclude dismissal, thereby indicating that the Act requires something more than a cursory explanation for the affidavit's absence. See *People v. Smith*, 40 Ill. 2d 562, 564 (1968); *People v. Curtis*, 48 Ill. 2d 25, 27-28 (1971). More recently, we have held that imprisonment, by itself, cannot excuse a defendant's failure to attach supporting material to a postconviction petition and that the defendant must provide "a reasonable explanation" for its absence or else summary dismissal is proper. See *People v. Harris*, 2019 IL App (4th) 170261.

¶ 32    Here, defendant contends that his statement in his petition that he is learning disabled and required a fellow prisoner to draft his petition constitutes an adequate, sufficient, and reasonable

_____

[1] Defendant makes no argument that there is any evidence in the record showing that Carter could provide him an alibi.

explanation for why he failed to attach Carter's affidavit. We disagree. Defendant's statement regarding his learning disability constitutes no explanation at all for the failure to attach Carter's affidavit, as defendant makes no argument that his learning disability precluded him from understanding that Carter's affidavit was required under the Act or that his learning disability in any way prevented him from contacting Carter to secure the affidavit.

¶ 33    In fact, defendant admits in his petition that he "diligently" wrote Carter seeking her affidavit but that he has "no knowledge" whether his letter to Carter "ever reached [its] destination." Defendant provides absolutely no explanation for why the letter would not have reached Carter, such as, for example, if he had sent the letter to the wrong address or the letter was intercepted prior to reaching Carter. Without any explanation for why the letter may not have reached Carter, his petition amounts only to a statement that he wrote Carter and asked her for an affidavit and she did not respond. Defendant fails to satisfy section 122-2 of the Act by merely writing Carter and requesting her affidavit; section 122-2 provides that he actually must secure the affidavit and attach it to his petition so as to show that the allegations of ineffective assistance of counsel are capable of objective or independent corroboration. Carter's failure to respond to defendant's request for an affidavit indicates (absent any other explanation) an inability or unwillingness to provide the required objective corroboration of his claim of ineffective assistance of counsel, which was fatal to defendant's petition and justified its summary dismissal.

¶ 34    Defendant argues that *People v. Williams*, 394 Ill. App. 3d 236 (2009), compels a different result. In *Williams*, the defendant was convicted of first degree murder and his conviction and sentence were affirmed on direct appeal. *Id.* The defendant filed a postconviction petition, which the court summarily dismissed. *Id.* at 240. The defendant subsequently sought leave to file a successive petition alleging various claims of ineffective assistance of trial counsel. *Id.* at 241. The

court denied the defendant leave to file the successive petition, finding that he failed to satisfy the cause and prejudice test. *Id.*

¶ 35    On appeal, the defendant argued that he sufficiently showed cause for failing to raise the ineffectiveness claims in the original petition because his trial counsel had failed to timely furnish him with the documentary evidence necessary to support those claims. *Id.* at 244. We held that the defendant failed to show cause because under section 122-2 of the Act he "could have but failed to explain in his original postconviction petition that his counsel failed to comply with his requests for the supporting documentation." *Id.* at 245-46.

¶ 36    Defendant here interprets *Williams* as holding that a petitioner satisfies the "affidavits, records, or other evidence" requirement of section 122-2 when he informs the court that a witness failed to respond to his request for the supporting documentation. Defendant argues that under *Williams*, he satisfied section 122-2 by stating in his petition that Carter failed to respond to his request to provide him with a supporting affidavit. However, *Williams* is inapposite, as the defendant there was seeking to obtain documentary evidence from his *trial counsel* to show counsel's own ineffectiveness. One can reasonably expect that counsel would be reluctant to provide the evidence showing his own ineffectiveness. See *e.g.*, *People v. Williams*, 47 Ill. 2d 1 (1970). Accordingly, the defendant's explanation that counsel failed to turn over evidence of his own ineffectiveness is sufficient under section 122-2 to excuse its absence. By contrast, in the present case, defendant was not seeking an affidavit or other evidence from his own attorney, but rather was seeking an affidavit from his cousin, Carter, who supposedly would provide him with an alibi. Unlike in *Williams*, there is no self-evident reason to expect that Carter would be reluctant to respond to his request for an affidavit if she indeed could provide an alibi for him. On these

facts, defendant's failure to attach Carter's affidavit attesting to his alibi or to offer any explanation as to why she did not respond to his request for such an affidavit is fatal to his petition.

¶ 37    Next, defendant argues that the postconviction court erred by summarily dismissing his claim of ineffective assistance based on counsel's failure to: (1) conduct a forensic comparison of the two pairs of his shoes recovered from Reed's residence with the bloody shoe print found at the scene, which would have shown no match; and (2) then introducing into evidence the forensic results showing that there was no match between his shoes and the shoe print. The State argues that defendant forfeited review by failing to argue in his postconviction petition that his counsel was ineffective for not investigating whether the bloody shoe print matched his two pairs of shoes. See 725 ILCS 5/122-3 (claims not raised in the original or amended petition are forfeited). Review of the postconviction petition reveals otherwise, as defendant therein argued that his counsel was ineffective for "fail[ing] to conduct an adequate and meaningful pretrial investigation" into certain "available exculpatory evidence." Defendant described the exculpatory evidence as including evidence that the bloody shoe print at the crime scene was "no match" to him. Given a liberal construction (*Hodges*, 234 Ill. 2d at 21), defendant's *pro se* petition raises the argument that his counsel was ineffective for failing to conduct the forensic comparison of his two pairs of shoes to the bloody shoe print left at the scene (showing no match) and failing to introduce the results of the comparison to the jury. Accordingly, we find no forfeiture.

¶ 38    The State also argues that defendant's claim of ineffective assistance is forfeited as it could have been raised on direct appeal. See *People v. Davis*, 2014 IL 115595, ¶ 13 (issues that could have been raised on direct appeal, but were not, are forfeited). For forfeiture purposes, our supreme court has drawn a distinction between claims of ineffective assistance based on what counsel actually did in presenting a defense at trial and claims of ineffective assistance based on what

counsel ought to have done in presenting a defense at trial. See *People v. West*, 187 Ill. 2d 418, 427 (1999). Generally, a claim of ineffective assistance based on what counsel did at trial is forfeited if not raised on direct appeal because all the information necessary for resolution of the issue is contained in the appellate record. *People v. Tate*, 2012 IL 112214, ¶ 14. However, here the postconviction claim of ineffective assistance is based on what counsel ought to have done in presenting a defense at trial and depends on proof of matters that could not have been included in the record on direct appeal precisely because of the allegedly deficient representation. Such a claim is better suited for postconviction proceedings where evidence beyond the scope of the record may be presented. *Id.*; *People v. Woods*, 2020 IL App (1st) 162751, ¶ 76. Accordingly, we reject the State's forfeiture argument and address the issue on its merits.

¶ 39    On the merits, the State argues that *People v. Scott*, 2011 IL App (1st) 100122 is dispositive. In *Scott*, we affirmed a first-stage dismissal of a postconviction petition alleging ineffective assistance for the failure to pursue DNA testing on a blue shirt allegedly worn by the shooter. The defendant maintained that DNA testing might have resulted in potentially exculpatory evidence because the absence of his DNA on the shirt, coupled with the presence of someone else's, would have suggested that he was wrongly identified by the State's witnesses. *Id.* ¶ 30. In rejecting the defendant's ineffective assistance claim, we reasoned that the defendant could not establish prejudice under *Strickland* because any arguments regarding the potential results of the unperformed testing were speculative. *Id.* ¶ 31. We noted that it was not known whether the shirt contained DNA sufficient for testing, "let alone whether the results would be exculpatory." *Id.* Without such test results, the defendant had failed to show a reasonable probability that the result of his trial would have been different had testing been pursued. *Id.*

¶ 40    In the instant case, the State argues that there still has been no forensic comparison of defendant's shoes to the bloody shoe print found at the scene and therefore we should find, similar to *Scott*, that defendant has not established prejudice under *Strickland* because any arguments regarding the potential results of the unperformed testing are speculative.

¶ 41    Defendant responds that *Scott* deviated from the relevant first-stage standards requiring us to take as true his allegations that a forensic comparison would show that his shoes did not match the bloody shoe print found at the scene. Defendant contends that the proper focus of the analysis is whether he made an arguable showing that his counsel provided ineffective assistance by failing to conduct the forensic comparison showing no match between his shoes and the shoe print, and by failing to introduce the results of the forensic comparison at trial.

¶ 42    Even taking as true defendant's allegations that a forensic comparison would show that his shoes did not match the bloody shoe print found at the scene, he has failed to make an arguable showing of prejudice under *Strickland* because review of the trial evidence shows that he still would have been convicted even if the jury had been so informed. Officer Weichart, the first responding officer at the scene, testified about observing the victim lying in a pool of blood at about 9:26 p.m. and securing and standing guard at the crime scene so that only other officers and emergency medical personnel could enter, but he made no mention of seeing a shoe print in the blood. The shoe print in the blood was testified to by Detective Carr, who arrived at the scene around 10 p.m. after the paramedics already had taken the victim to the hospital. Carr stated that at that time, he saw a bloody shoe print west of the two vehicles in the garage. A photograph of the crime scene showing the bloody shoe print was published to the jury; Weichart testified that the photograph depicted "the state of the garage *after* the emergency ambulance personnel took the body to the hospital." (Emphasis added.) All this evidence suggests that the bloody shoe print

was left sometime between Weichart's arrival at the crime scene at 9:26 p.m. when the victim still was lying between the two vehicles, and Carr's arrival 34 minutes later at 10 p.m. after the victim had been taken to the hospital by paramedics. As the murderer already had departed the scene as of the relevant 34-minute timeframe from 9:26 to 10 p.m., the bloody shoe print must have been left by someone other than the murderer. Given that the bloody shoe print was left after the murder had been committed, and by someone other than the murderer, a forensic comparison showing that defendant's shoes did not match the shoe print would have been irrelevant to a determination of his guilt or innocence and would not even arguably have led to a different result at trial.

¶ 43    In so holding that defendant failed to make an arguable showing of prejudice under *Strickland*, we also note the overwhelming other evidence against him, namely: that defendant's watch containing his DNA was found inside the victim's vehicle; defendant's watchband, containing the victim's blood, was found underneath the victim's vehicle; after the murder and robbery, defendant (who had been staying at his brother's house and had no money) went to a family party, wearing new clothes and flashing money that he claimed came from an ex-girlfriend, however she testified that she did not send him the money; and at the party, defendant showed off a dull and tarnished wedding band and engagement ring belonging to the victim, which he subsequently took to a jewelry store to have resized and engraved to his fiance. Given the overwhelming evidence against defendant and the lack of relevance regarding any comparison between his shoes and the bloody shoe print at the scene, the court did not err by summarily dismissing his claim of ineffective assistance of counsel based on lack of prejudice.

¶ 44    For all the foregoing reasons, we affirm the circuit court.

¶ 45    Affirmed.